

**Filed**
Supreme Court of Guam, Clerk of Court

# IN THE SUPREME COURT OF GUAM

## PEOPLE OF GUAM,
Plaintiff-Appellee,

**v.**

## WILLIAM JOHN PINAULA,
Defendant-Appellant.

Supreme Court Case No.: CRA20-012
Superior Court Case No.: CF0684-17

## AMENDED OPINION ON REHEARING

## Cite as: 2023 Guam 2

Appeal from the Superior Court of Guam
Argued and submitted on November 30, 2021
Rehearing Petition argued and submitted on February 27, 2023
Hagåtña, Guam

Appearing for Defendant-Appellant:
Peter C. Perez, *Esq.*
Law Office of Peter C. Perez
DNA Bldg.
238 Archbishop Flores St., Ste. 802
Hagåtña, GU 96910

Appearing for Plaintiff-Appellee:
Courtney Leigh Scalice, *Esq.* (briefed)
Jordan L. Pauluhn, *Esq.* (briefed and argued)
Assistant Attorneys General
Office of the Attorney General
Prosecution Division
590 S. Marine Corps Dr., Ste. 802
Tamuning, GU 96913



**E-Received**
3/20/2023 8:20:06 AM

BEFORE: ROBERT J. TORRES, Chief Justice; F. PHILIP CARBULLIDO, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**TORRES, C.J.:**

[1]      This Amended Opinion supersedes in its entirety the prior opinion of this court in *People v. Pinaula*, 2022 Guam 3.  Defendant-Appellant William John Pinaula was convicted of one charge of Theft by Receiving.  On appeal, he challenges the sufficiency of the evidence against him, admission of a statement made by his uncle that Pinaula argues was inadmissible hearsay, and allegedly improper statements made by the prosecutor.  Plaintiff-Appellee People of Guam ("People") challenge this court's subject matter jurisdiction to hear the appeal, arguing the notice of appeal was untimely.  We hold Pinaula's appeal was timely, we have jurisdiction to hear the appeal, and the evidence against Pinaula was insufficient to support the conviction.  Consequently, we deny the People's motion to dismiss on jurisdictional grounds and reverse the conviction, vacating the judgment.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

[2]      Pinaula was charged with Theft by Receiving (as a Second Degree Felony) (two charges); Theft of Property (as a Second Degree Felony); and Theft of Property (as a Third Degree Felony). The day before trial, the People moved to dismiss the two Theft of Property charges, which the trial court granted.  The People then filed an Amended Superseding Indictment that alleged:

> **CHARGE ONE**
> On or about May 18, 2017, in Guam, **WILLIAM JOHN PINAULA** did commit the offense of ***Theft by Receiving (As a 2nd Degree Felony)***, in that he did intentionally receive, retain or dispose of the movable property of *Morrico Equipment*, that is, ***a 2006 Mitsubishi Fuso Flat Bed Truck (GLP #238CV)***, knowing that it had been stolen or believing that it had probably been stolen, in violation of 9 GCA §§ 43.50(a), 43.20(a) and 43.30(a), as amended.

**CHARGE TWO**
On or about May 18, 2017, in Guam, **WILLIAM JOHN PINAULA** did commit the offense of ***Theft by Receiving (As a 2nd Degree Felony)***, in that he did intentionally receive, retain or dispose of the movable property of *Morrico Equipment*, that is, ***a Boss Brand Industrial Light Tower***, knowing that it had been stolen or believing that it had probably been stolen, the amount involved exceeding $1,500.00, in violation of 9 GCA §§ 43.50(a), 43.20(a) and 43.30(a), as amended.

RA, tab 78 (Am. Superseding Indictment, Aug. 26, 2019).

[3]     The prosecution's opening remarks included these statements:

[T]he government's case is not perfect. I will submit that Mr. Pinaula could not have done this by himself. There has to be somebody else involved. He lives far away from Morrico Equipment. I doubt he walked all the way to Morrico, took the stuff, and left. So, either he took it himself or somebody else took it and went to him and gave it to him. Either way, he received the stolen property. . . . The evidence will show, and the government will meet its burden, that every element on receiving stolen property will be demonstrated that Mr. Pinaula is at least one of the persons involved, and he's one person involved. There's more than one person. We don't know who the other person is. Or other persons. But he's involved, and that's enough for you to find him guilty.

Transcript ("Tr.") at 18 (Jury Trial, Aug. 27, 2019).

[4]     During the People's case-in-chief, the following evidence was presented. On the morning in question, Rene Molinos, the General Manager of Morrico Equipment ("Morrico"), arrived at Morrico's facility on Ypao Road in Tamuning at around 5:30 a.m. As he entered, he noticed the front gate was open and unchained. Molinos testified that the gate was normally secured every night with a chain and padlock, but the chain had been cut, and he saw a chain link on the ground. As he looked around the facility, Molinos observed that some of Morrico's property was missing, specifically, a Boss brand industrial light tower and a 2006 Mitsubishi Fuso flatbed truck. Molinos then called the Guam Police Department ("GPD") to report the break-in.

[5]     Before law enforcement arrived, Molinos reviewed on his computer the location history of a GPS device previously installed on the missing truck. According to Molinos, the GPS device's tracking history indicated that the truck was parked behind a house in Adacao, that the truck had

left the Morrico facility around midnight, and that it had been parked in Adacao since around 4:00 a.m. that morning.  Molinos also reviewed surveillance footage and testified it showed a "guy come from the back area," with a light around midnight, "moving around where [the] truck was at." *Id.* at 27.

[6]      Officer Florencio Querubin responded to the incident at Morrico and spoke with Molinos. Officer Querubin said he reviewed the surveillance footage, and it showed movement near a vehicle in the parking lot and a flashlight going on and off.  Also in the surveillance footage, Officer Querubin saw the door of a vehicle open; a flashlight going through the cabin area; and the vehicle moving around the parking lot and exiting the facility at approximately 1:00 a.m. Because it was "[t]oo dark" and the video quality was "kind of grainy," Officer Querubin could not see the stature of the person or whether other individuals were involved. *Id.* at 57.  While at Morrico, Officer Querubin was informed by Molinos of the location of the missing truck based on information derived from the GPS device installed on it.

[7]      Officer Richard Wright was called to assist in the recovery of the missing truck.  He testified that when he arrived, his partner, Officer Angel Santos, was already at the location at which they found the truck, near Thier Lane in Adacao.  When he arrived on scene, Officer Wright noticed a truck parked in an open field about 100 feet behind a home.  He stated that the truck could not be seen from the roadway because of heavy vegetation.  Officer Wright verified it was the truck reported stolen by Morrico and saw that it contained Morrico insignia on the side and "visible signs" that it belonged to Morrico on the truck's mud flaps. *Id.* at 72.  He also observed that the truck looked to be "in disarray" and that the ignition "appeared to be tampered with as if somebody tried to access the ignition to start [the] truck." *Id.*  Officer Wright recovered the truck and contacted its owner.

**[8]**     Molinos proceeded to Adacao to retrieve the truck. When he arrived, he noticed that the steering column of the truck was broken and that it was missing some hose reels. Molinos also observed that an air compressor at the back of the truck was unbolted and removed but still present. Based on the location history of the GPS device attached to the truck, Molinos and GPD found the missing industrial light tower along Chalan Natibu in Dededo.[1] Molinos testified that a tow hitch on the back of the truck was generally used to transport the industrial light tower.

**[9]**     During the police investigation in Adacao, Officer Wright stated that his partner, Officer Santos, was tasked with canvassing the area for possible witnesses. Herbert Pinaula ("Herbert"), whose home and property were near the location where the truck was found, spoke with law enforcement. Herbert identified Pinaula (i.e., the defendant) as his next-door neighbor and the son of his brother. He stated that Pinaula resided in the adjacent home with his mother, Edith (Herbert's sister-in-law), and that their homes sat on a one-acre property, which was divided in half with separate backyards.[2]

**[10]**     Herbert said he informed law enforcement of a flatbed work truck he saw in Pinaula's backyard that "didn't belong there." *Id.* at 79. He recalled that when he saw Pinaula come out of his home that morning, he asked him to whom the truck belonged, and Pinaula responded: "it was my friend's truck." *Id.* at 80-81, 89. During his testimony, Herbert positively identified the truck in photos taken by law enforcement and admitted as evidence. Herbert also testified that he did not see the truck the day before his conversation with Pinaula, that he did not know to whom the truck belonged, and that he knew it was not Pinaula's truck because he identified Pinaula as driving

---

[1] Other facts relating to the recovery of the industrial light tower have been intentionally omitted from this Opinion because the trial court dismissed the related charge.

[2] The arresting officer testified that the police had spoken with the defendant's mother multiple times and that, contrary to Herbert's testimony, she asserted that the defendant "doesn't stay here." Tr. at 97, 99 (Aug. 27, 2019).

a yellow jeep.  Herbert had no suspicions about the truck because he had "never known [the defendant] to actually bring something back there that didn't belong to us." *Id.* at 80.

[11]    Herbert could not "really remember" whether the defendant was near the vehicle. *Id.* at 90.  First, he testified: "Well, he went over.  I didn't see him go over." *Id.*  Upon further questioning, he denied "see[ing] him around the vehicle" and denied that the defendant had been "touching the vehicle when [Herbert] talked to him at all." *Id.*

[12]    Officer Eric Mondia, who was assigned to the GPD Property Crimes Unit, testified that he began his investigation into the matter in December 2017.  Law enforcement returned several times to the property where the truck was found but could not locate Pinaula.  Ultimately, they identified the license plate number of the yellow jeep that Pinaula was alleged to be driving, and Officer Mondia came across the jeep parked outside an unidentified residence while executing a search warrant at an adjacent property in a separate investigation.  He subsequently discovered Pinaula at the residence and arrested him.  The police searched Pinaula's residence pursuant to a warrant, but Officer Mondia could not recall finding any of the missing hose reels or air compressor bolts.

[13]    After the close of the People's case, Pinaula moved to dismiss the charges.  Upon hearing arguments, the trial court granted the motion as to the Theft by Receiving charge related to the industrial light tower.  The people filed a Second Amended Superseding Indictment.  The prosecution presented closing arguments and stated in part:

> I'm asking you to find [Pinaula] guilty.  The burden's mine.  The burden is the People of Guam's burden to prove it.  Okay?  And we can never put a number or a percentage of how sure you should be, but there's one thing that I like to call the sleep test, and it works both ways.  You're going to vote today on whether he's guilty or not guilty of being involved in this crime of receiving stolen property. The sleep test is will you be able to sleep with your vote?  If you vote him not guilty based on all the information that you've heard, will you be able to sleep?  If you vote him guilty based on all the information and using your common sense and life experience, will you be able to sleep with that vote?  I call that the sleep test.  So, think about it.  Will you be able to sleep with your vote?

. . . .

[T]hey're going to ask you to believe that [Pinaula] didn't know it was stolen. Come on, folks. Really? Sleep test.

. . . .

Will you be able to sleep tonight with your vote? I believe that the People of Guam has met its [sic] burden based on the elements that I've read to you. Based on all of the evidence and information and facts and circumstances that have been presented to you during this trial.

Tr. at 8-9, 11-12 (Jury Trial, Aug. 28, 2021).

[14] The jury deliberated and returned a guilty verdict against Pinaula on the remaining charge of Theft by Receiving of the truck. The trial court sentenced Pinaula to eight years of incarceration with credit for time served. The Judgment and Notice of Entry on Docket were filed on November 30, 2020.

[15] On December 15, 2020, Pinaula filed his notice of appeal. Pinaula argues that his conviction must be overturned on three grounds. First, he argues that the evidence was insufficient to sustain his conviction. Appellant's Br. at 12 (Mar. 16, 2021). Second, he argues that the trial court erred in admitting the testimony of Pinaula's Uncle Herbert about Pinaula's statement to Herbert that the truck belonged to Pinaula's friend; Pinaula argues that the statement was inadmissible hearsay. *Id.* at 12-13. Third, Pinaula argues that the prosecutor's statements that Pinaula was "'involved, [and] that's enough . . . to find him guilty'" and the prosecutor's statements about the "'sleep test'" were improper. *Id.* at 13.

[16] In their opposition brief, the People acknowledged that Pinaula's notice of appeal was filed after the ten-day deadline in Guam Rules of Appellate Procedure ("GRAP") 4(b)(1)(A)(i) but stated the notice of appeal was timely under this court's Eleventh and Twelfth Updated Orders relating to the COVID-19 pandemic. Appellee's Br. at 2-3 (May 10, 2021). Following submission

of briefs on the merits in this appeal, the People reversed their position and moved to dismiss for lack of jurisdiction, arguing that the appeal was untimely under 8 GCA § 1.25. *See* Appellee's Mot. Dismiss at 3-4 (Aug. 20, 2021). We ordered the parties to file supplemental briefs addressing "whether the court has the power under the Organic Act to promulgate and apply a rule for computing time, namely GRAP 11, as applicable to filing a criminal appeal, notwithstanding 8 GCA § 1.25's method of computing time." Order & Scheduling Order (Oct. 5, 2021). We first address the timeliness of the appeal and then the merits.

## II. JURISDICTION

[17]     The People style their motion to dismiss as a jurisdictional issue, stating that "[s]ubject matter jurisdiction is a threshold matter and may be raised at any time." Appellee's Mot. Dismiss at 1-2 (first citing *Port. Auth. of Guam v. Civil Serv. Comm'n (Guevara)*, 2018 Guam 1 ¶ 18; and then citing *People v. Angoco*, 2006 Guam 18 ¶ 7). They also argue "the *timely* filing of a notice of appeal is mandatory and jurisdictional." *Id.* at 2 (citations omitted); *see also* Appellee's Suppl. Br. at 1 (Oct. 19, 2021) ("This court lacks jurisdiction because the Notice of Appeal was untimely filed in this case."). Because jurisdiction is a threshold matter, we will address this issue first.

### A. Appeal Filing Deadlines Prescribed by Statute Are Jurisdictional; But Timelines Prescribed Only in Court-Made Rules Are Claim-Processing Rules Subject to Waiver or Forfeiture

[18]     The Supreme Court of the United States recently underscored that not all filing deadlines are "jurisdictional." "[A]n appeal filing deadline prescribed by statute will be regarded as 'jurisdictional,' meaning that late filing of the appeal notice necessitates dismissal of the appeal." *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 16 (2017) (citing *Bowles v. Russell*, 551 U.S. 205, 210-213 (2007)). "But a time limit prescribed only in a court-made rule, *Bowles* acknowledged, is not jurisdictional; it is, instead, a mandatory claim-processing rule subject to forfeiture if not properly raised by the appellee." *Id.* at 16.

**[19]** The Court explained, "The 'mandatory and jurisdictional' formulation is a characterization left over from days when we were 'less than meticulous' in our use of the term 'jurisdictional.'" *Id.* at 21 (quoting *Kontrick v. Ryan*, 540 U.S. 443, 454 (2004)). The same is true for our decisions, and we want to clarify, in alignment with United States Supreme Court precedent, that only statutory appeal filing deadlines are considered "jurisdictional"; time limits found in court-made rules are not jurisdictional but mandatory claim-processing rules subject to forfeiture or waiver if not properly raised.

**[20]** Whether this court has jurisdiction to hear the appeal turns on whether the applicable time limitation is found in statute (as the People argue), or the Guam Rules of Appellate Procedure (as Pinaula argues). If in a statute, the time limit is jurisdictional, and "deprives [the] court of adjudicatory authority over the case, necessitating dismissal—a 'drastic' result." *Id.* at 17 (quoting *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)). If in the GRAP, the time limit is not jurisdictional, but a mandatory claim-processing rule which can be waived or forfeited. *See id.* at 17-18 (noting that a "time limit not prescribed by Congress" is a mandatory claim-processing rule which, if "properly invoked" must be enforced but can be "waived or forfeited"); *see also Rios*, 2011 Guam 6 ¶ 11 n.4 (summarizing earlier results of United States Supreme Court cases addressing jurisdictional and claim-processing rules).[3]

**[21]** This presents a somewhat circular situation. If the statute controls, then the issue is jurisdictional, the appeal was untimely, and the court has no jurisdiction to hear the appeal. If the

---

[3] For this reason, Pinaula's reliance on *United States v. Lopez*, 562 F.3d 1309 (11th Cir. 2009), is misplaced. The case held that time limits for a criminal defendant were not jurisdictional because they were not based on a federal statute. *Id.* at 1310; *see* Appellant's Opp'n Mot. Dismiss at 8 (Sept. 14, 2021); Appellant's Suppl. Br. at 3 (Nov. 3, 2021). Here, by contrast, the relevant question is *which time limits control*: those in a statute or those in a court-created rule.

court rule controls, then the issue is not jurisdictional, the appeal was timely, and the court has jurisdiction to hear the appeal.[4]

## B. Calculation of Time to File an Appeal under GRAP 11 and 8 GCA § 1.25

[22]    Both the GRAP and the Criminal Procedure statute provide that a defendant's notice of appeal in a criminal case must be filed within ten days of the entry of either the judgment or the order being appealed. Guam R. App. P. 4(b)(1)(A)(i); 8 GCA § 130.40 (2005). A conflict emerges in the calculation of those ten days. The relevant statutory provision, 8 GCA § 1.25, and rule, GRAP 11, give divergent instruction on which days to include in the calculation. They respectively state:

| 8 GCA § 1.25 | GRAP 11 |
|---|---|
| (a) In computing any period of time the day of the act or event from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday or a legal holiday, in which event the period runs until the end of the next day which is not a Saturday, a Sunday or legal holiday. **When a period of time prescribed or allowed is less than seven (7) days, intermediate Saturdays, Sundays and legal holidays, shall be excluded in the computation.**<br><br>. . . .<br><br>(d) Whenever a party has the right or is required to do an act within a prescribed period after the service of a notice or other paper upon him and the notice or other paper is served upon him by mail, three (3) days shall be added to the prescribed period. | Rule 11 -- Computing and Extending Time.<br><br>(a) Computing Time. The following rules apply in computing any time period specified in these rules, in any local rule or court order, or in any statute that does not specify a method of computing time.<br><br>(1) Period Stated in Days or a Longer Unit. When the period is stated in days or a longer unit of time:<br><br>(A) exclude the day of the act, event, or default that begins the period;<br><br>**(B) exclude intermediate Saturdays, Sundays and legal holidays when the period is less than eleven (11) days, unless stated in calendar days; and** |

---

[4] If the court rule controls, even if the appeal was untimely, the People would have waived the argument by agreeing in their opposition brief that the appeal was timely. *See Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 17 (2017) ("[a] time limit not prescribed by Congress ranks as a mandatory claim-processing rule;" such rules, "[i]f properly invoked, . . . must be enforced, but they may be waived or forfeited"); Appellee's Br. at 2-3 (May 10, 2021).

|  | (C) include the last day of the period unless it is a Saturday, Sunday, or legal holiday, in which case the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.<br><br>. . . .<br><br>(c) Additional Time after Service.  When a party is required or permitted to act within a prescribed period after a paper is served on that party, three (3) calendar days are added to the prescribed period unless the paper is delivered on the date of service stated in the proof of service.  For purposes of this rule, a paper that is served electronically is not treated as delivered on the date of service stated in the proof of service. |

8 GCA § 1.25 (2005) (emphasis added); GRAP 11 (emphasis added).

[23]     The key distinction between the two methods for computing time is the inclusion or exclusion of Saturdays, Sundays, and legal holidays.  Under GRAP 11, such days are excluded when the period prescribed is less than eleven days (unless stated in calendar days); but under section 1.25, weekends and holidays are excluded when the period is less than seven days.  Thus, because the time to file a criminal appeal is ten days after the entry of judgment, *see* GRAP 4(b)(1)(A)(i); 8 GCA § 130.40, Saturdays, Sundays, and legal holidays are excluded under GRAP 11 but not excluded under section 1.25.

[24]     Under GRAP 11, Pinaula's appeal was timely filed.  The NEOD was filed November 30, 2020, and Pinaula's notice of appeal was filed on December 15, 2020.  Excluding Saturdays, Sundays, and legal holidays (here: December 8, Our Lady of Camarin Day), Pinaula's appeal was

filed on the tenth day of the period.  Under section 1.25, Pinaula's notice of appeal was five days late.[5]

## C.  A Conflict Exists Between 8 GCA § 1.25 and GRAP 11

[25]    GRAP 11(a) applies "in computing any time period specified in these rules, in any local rule or court order, or in any statute that does not specify a method of computing time."  The People argue that the rule is inapplicable because there is a statute that specifies a method of computing time.  Appellee's Mot. Dismiss at 5-6; *cf.* Appellee's Suppl. Br. at 5-9 (arguing that the rule and statute can be read harmoniously); Appellee's Suppl. Reply Br. at 1 (Nov. 8, 2021).  This position misreads the GRAP.  The instances in which the rule is applicable are listed disjunctively, and the first instance is "in computing any time period specified in [GRAP]."  GRAP 11(a).  GRAP 4(b) provides a ten-day window in which to file a criminal appeal, putting this within the first instance noted in GRAP 11(a).[6]  *See* GRAP 4(b)(1)(a)(i); GRAP 11(a).

[26]    The People cite *State ex rel. HeplerBroom, LLC v. Moriarty*, 566 S.W.3d 240 (Mo. 2019) (en banc), as "[a] good example of reconciling and harmonizing superficial tension between statutes and court rules."  Appellee's Suppl. Br. at 7.  The case is distinguishable, because the relevant rule did not impose any time limit while the statute did.  *See* 566 S.W.3d at 244.  Here,

---

[5] Pinaula also argues that the court's Administrative Orders relating to the Coronavirus pandemic tolled the pertinent filing deadline.  Appellant's Opp'n Mot. Dismiss at 3-6.  As the People correctly point out in their motion, however, the plain text of the orders makes them inapplicable here.  *See Re: Eleventh Updated Order Relative to Court Operations Under Exigent Circumstances Related to COVID-19 (Coronavirus)*, ADM20-413 at 6-7, 10 (Admin. Order No. 2020-413, Oct. 9, 2020) (tolling preliminary examination, indictment filing, and speedy trial time periods through December 31, 2020, and, "[w]ith the exception of the filing of indictments, all filing deadlines—including statutory filing deadlines— . . . from August 16, 2020, until October 19, 2020"); *Re: Twelfth Updated Order Relative to Court Operations Under Exigent Circumstances Related to COVID-19 (Coronavirus)*, ADM20-414 at 2 (Admin. Order No. 2020-414, Dec. 23, 2020) (tolling only preliminary examination, indictment filing, and speedy trial time periods); *see also* Appellee's Mot. Dismiss at 4-5; Appellee's Reply Supp. Mot. Dismiss at 2 (Sept. 21, 2021).

[6] This Opinion does not apply GRAP 11(a) to 8 GCA § 1.30.40.  Neither does this Opinion invalidate the time computation method found in 8 GCA § 1.25.  In this specific instance, 8 GCA § 1.25 does not apply, and the method for computing time is instead found in GRAP 11(a).

by contrast, both the rule and the statute provide instructions on how to calculate the relevant time period. *See* 8 GCA § 1.25; GRAP 11.

[27]    Asserting that the court must "first harmonize the language of a statute with the language of a court rule" if possible, and declaring that to be feasible here, the People advance several arguments for the proposition that "[t]his case is not an appropriate vehicle" for the question presented in the court's October 5, 2021 Order. Appellee's Suppl. Br. at 5-13. Because the rule and the statute are both facially applicable here and they cannot be reconciled, these arguments are unavailing. We must proceed to the question presented to the parties in our October 5, 2021 Order: "whether the court has the power under the Organic Act to promulgate and apply a rule for computing time, namely GRAP 11, as applicable to filing a criminal appeal, notwithstanding 8 GCA § 1.25's method of computing time." Order (Oct. 5, 2021). We find that we do have such authority.

## D.  Where a Court Rule and Statute Conflict on a Procedural Issue, the Rule Controls

### 1.  The People's arguments that the rule should yield are unavailing

[28]    The People advance several arguments to suggest that if found to conflict with the rule, the statute should control. These arguments are not persuasive because they assume the answer to a threshold question and mischaracterize the discrepancy.

[29]    Most directly, the People argue that because the timeline for an appeal is mandatory and jurisdictional, the issue is jurisdictional rather than procedural, and thus the statute should control. *See* Appellee's Suppl. Br. at 13-14. However, the United States Supreme Court has already held that only statutory time limits are jurisdictional; time limits prescribed in court-made rules are not jurisdictional but mandatory claim-processing rules subject to waiver and forfeiture. *Hamer*, 138 S. Ct. at 16 (first citing *Bowles*, 551 U.S. at 210-213; and then citing *Kontrick*, 540 U.S. at 456).

Thus, the timeline would be jurisdictional only if it were found in 8 GCA § 1.25 rather than GRAP 11.

[30]     Relatedly, the People argue that the court's jurisdiction cannot be expanded by court rules. *See* Appellee's Mot. Dismiss at 6-7; Appellee's Suppl. Br. at 16.  GRAP 1 also emphasizes that "[n]othing in these rules shall be construed to extend or limit the appellate jurisdiction of the Supreme Court of Guam as established by law."  In a similar vein, at oral argument, the People urged that because the statute, rather than GRAP, confers the right to an appeal, the issue is substantive and so the statute should control.  *See, e.g.*, Oral Argument at 10:54:27-47; 11:03:51-56 (Nov. 30, 2021); *see also* Appellee's Suppl. Br. at 14 (arguing that "the right to appeal is a statutory creation, and is not subject to alteration by the court or court rules").  Similarly, the People pointed out that under 8 GCA § 130.35, "the only step that affects 'the validity of the appeal'" is the "timely filing of the notice of appeal."  Appellee's Suppl. Br. at 6 (quoting 8 GCA § 130.35 (2005)).

[31]     We underscore that both the court rule and the statute require the defendant to file the notice of appeal within ten days of the entry of either the judgment or the order being appealed.  *See* GRAP 4(b)(1)(A)(i); 8 GCA § 130.40.  The discrepancy arises in *how to calculate those ten days*. Thus, the question is not whether the court may expand its jurisdiction over appeals, but rather how to carry out the administration of the jurisdiction it already has.  If the time calculation is not "jurisdictional," its application cannot be said to impermissibly "expand" jurisdiction.  Again: only if the statute controls could the issue be "jurisdictional."  *See Hamer*, 138 S. Ct. at 16.  We must decide first whether the rule or statute controls to determine whether the issue is jurisdictional.

//

//

### 2. Where a rule and statute cannot be harmonized, generally the statute controls where the issue is substantive and the rule controls where the issue is procedural

[32]    Multiple jurisdictions have found that a court should first attempt to harmonize application of a court-made rule and a statute. Although caselaw is divided, many jurisdictions agree that if harmonization is impossible, the statute should control if the issue is "substantive," but the rule should control where the issue is "procedural." We concur.

[33]    At least three sources have compiled lists of jurisdictions that subscribe to the general proposition that "if a certain matter that is the subject of both a statute and a court rule is substantive in nature, the statute will control, but the court rule controls if the matter is procedural." 21 C.J.S. *Courts* § 169 (May 2022 Update); *see also* 20 Am. Jur. 2d *Courts* § 50 (May 2022 Update); H.D.W., Annotation, *Power of Court to Prescribe Rules of Pleading, Practice, or Procedure*, 158 A.L.R. 705 (1945) (supplementing M.C. Dransfield, Annotation, *Power of Court to Prescribe Rules of Pleadings, Practice, or Procedure*, 110 A.L.R. 22 (1936)). We agree with the general proposition that statutes trump inconsistent rules where the matter is substantive but court-promulgated rules should control where the issue is procedural.

### 3. How to calculate the time to file an appeal is a procedural issue; the rule controls

[34]    We hold that determination of how to calculate the time to file an appeal is a procedural issue, and the rule controls. *Corpus Juris Secundum* addressed the circumstance before this court: whether calculation of time to file an appeal is substantive or procedural.

> The rule that supreme court rules remain supreme when in conflict with legislation enacted by the legislature has an exception when the statutory rule is based upon a fixed public policy that has been legislatively or constitutionally adopted and has as its basis something other than court administration. Generally, statutes governing appeals are given deference only to the extent to which they are compatible with a supreme court's rules; conflicts that compromise those rules are resolved with the rules remaining supreme. For example, a court rule stating a 30-day period to appeal to the circuit court from a county court supersedes a statute that provides a six-month period to appeal where the legislature has no reason to provide a six-month period to appeal from a county court order.

21 C.J.S. *Courts* § 169 (citations omitted).

[35]    The case of *Citizens for a Safer Carroll County v. Epley*, 991 S.W.2d 562 (Ark. 1999), cited in *Corpus Juris Secundum*, illustrates this point.  The court first noted that "as a general rule, statutes are given deference only to the extent to which they are compatible with our rules and conflicts which compromise those rules are resolved with our rules remaining supreme."  *Id.* at 564.  The court in *Epley* then said, however, that "there is an exception to this general rule: when the statutory rule is based upon a fixed public policy which has been legislatively or constitutionally adopted and has as its basis something other than court administration."  *Id.*  The court ultimately held that the statutory shorter time to file an appeal in election disputes controlled over a longer period found in the rules because "[t]he Legislature has adopted a shorter appeal time based upon the strong public policy in favor of resolution of such an issue prior to the time for the general election."  *Id.*

[36]    *Pike Avenue Development Co. v. Pulaski County*, 37 S.W.3d 177 (Ark. 2001), a case decided just two years later, reveals the flip side of the coin.  *Pike* also addressed a conflict existing between a court rule and a statute regarding time to file an appeal.  37 S.W.3d at 178.  The court began with "the general rule that, to protect what it holds inviolate, [the court] defers to the General Assembly in [conflicts between court rules and legislation] only to the extent that the conflicting court rules' primary purposes and effectiveness are not compromised; otherwise, the rules remain supreme."  *Id.*  Citing *Epley*, the court reiterated the exception to this general principle "when the General Assembly's statutory rule is based upon a fixed public policy that has been legislatively or constitutionally adopted and has as its basis something other than court administration."  *Id.* (citing *Epley*, 991 S.W.2d 562).

[37] In *Pike*, however, the court "could find no perceivable public policy reason for the General Assembly to provide a six-month period to appeal from a county court order" and thus held that the rule controlled. *Id.* (noting that the court was "unaware of why appeals from county court decisions involving property assessment adjustments should require a longer period of time to appeal than any other inferior court decision"). The court contrasted the case to what it called the "obvious" public policy of a seven-day limit to appeal an election contest "because disputes related to elections must be resolved quickly in order that public offices may be filled and the people served." *Id.* at 178 n.1 (contrasting the case with *Weems v. Garth*, 993 S.W.2d 926 (Ark. 1999)).

[38] Here, like in *Pike*, we can find no policy objective that is advanced by the inclusion of weekends and holidays depending on whether the prescribed time period is less than seven versus eleven days. It appears to be merely a matter of procedural expediency.

[39] Other jurisdictions addressing the issue have come to the same conclusion: generally, court rules prevail over inconsistent statutes relating to time to file an appeal. New Mexico courts have stated unambiguously that "[w]hen a statute governing the time for appeal conflicts with a supreme court rule, the rule governs." *Tzortzis v. Cnty. of Los Alamos*, 773 P.2d 363, 363 (N.M. Ct. App. 1989); *see also Am. Auto. Ass'n v. State Corp. Comm'n*, 697 P.2d 946, 947 (N.M. 1985) ("The law is clear that on procedural matters such as time limitations for appeals, a rule adopted by the Supreme Court governs over an inconsistent statute. This is predicated upon the constitutional doctrine that the Court has the power to regulate pleading, practice and procedure within the courts." (citations omitted)).

[40] Indiana courts have similarly stated bluntly that "[w]here there is a direct conflict between the statute and the [appellate] rule[s . . .] in a purely procedural matter fixing a time limitation on appeals, the statutory provision must fall." *Citizens Indus. Grp. v. Heartland Gas Pipeline, LLC*,

856 N.E.2d 734, 738 (Ind. Ct. App. 2006) (second and third alterations in original) (quoting *McCormick v. Vigo Cnty. High Sch. Bldg. Corp.*, 226 N.E.2d 328, 331 (Ind. 1967)).

[41]    In 1950, the New Jersey Supreme Court performed a detailed constitutional analysis on this topic. *See Winberry v. Salisbury*, 74 A.2d 406, 408-14 (N.J. 1950). It ultimately concluded that although "confined to practice, procedure and administration as such," "the rule-making power of the Supreme Court is not subject to overriding legislation." *Id.* at 414. Time to take an appeal was considered procedural. *See id.* at 408, 414.

[42]    The Supreme Court of Arizona performed a somewhat similar analysis in *Burney v. Lee*, 129 P.2d 308 (Ariz. 1942), evaluating whether a court-promulgated rule for time to appeal superseded an earlier statute. The court collected cases for the "almost unanimous[]" proposition that "courts have the inherent power to prescribe rules of practice and rules to regulate their own proceedings in order to facilitate the determination of justice, without any express permission from the legislative branch." *Id.* at 309. The extent of that power vis-à-vis the legislature's power, however, was not decided because a statute explicitly granted the court power to make procedural rules and stated that inconsistent statutes would remain in effect only until modified or suspended by new court rules. *See id.* at 310.

[43]    Several cases cited above address the *number of days* in which to file an appeal. The present controversy addresses instead merely *how to calculate* those days. If the number of days to file an appeal has been considered procedural rather than substantive, how much more procedural is the question of how to administratively mark those days on the calendar?

[44]    We need not, and do not, decide today whether the number of days to file an appeal is properly considered procedural or substantive, as both the statute and the rule agree the defendant must file the notice of appeal within ten days of the entry of either the judgment or the order being

appealed. *See* GRAP 4(b)(1)(A)(i); 8 GCA § 130.40. Thus, our holding does not address whether authority to define the number of days to file an appeal is properly held by the court or the legislature.

[45]    We hold that where a statute and court-promulgated rule each relate to the method used to calculate time to file an appeal and irreconcilably conflict, absent some clear and obvious policy consideration advanced by the statute which has its basis in something other than court administration, the court rule should control. Here we find no such policy consideration, and thus the method for computing time in GRAP 11 controls over the conflicting method in 8 GCA § 1.25 on this procedural issue.

## E.  This Conclusion Reflects Our Mandate and Authority Under the Organic Act

### 1.  Procedural rulemaking is an organic power of the Supreme Court of Guam; the Legislature may not infringe upon this authority

[46]    Procedural rulemaking is an organic power of the Supreme Court of Guam. 48 U.S.C.A. § 1424-1(a)(6) (Westlaw through Pub. L. 117-139 (2022) ("The Supreme Court of Guam shall . . . make and promulgate rules governing the administration of the judiciary and the practice and procedure in the courts of the judicial branch of Guam . . . ."). The separation of powers doctrine is recognized in Guam. *See, e.g.*, *Villagomez-Palisson v. Superior Court*, 2004 Guam 13 ¶ 14 (citing *In re Gutierrez*, 2002 Guam 1 ¶ 32); *see also* 48 U.S.C.A. § 1421a (Westlaw through Pub. L. 117-139 (2022) ("The government of Guam shall consist of three branches, executive, legislative, and judicial . . . ."). Here, the judiciary's organic rule-making authority is infringed upon by legislation outlining a method for computing time to file a criminal appeal that conflicts with the Guam Supreme Court's own Rules of Appellate Procedure.

[47]    Separation of powers questions are evaluated case-by-case and begin from the general proposition that legislation is presumed to be constitutional. *In re Request of Leon Guerrero*, 2021

Guam 6 ¶ 24 (per curiam). The court "zealously" adheres to the doctrine of separation of powers and has often "protected both the legislative and executive branches of government from interference." *Hamlet v. Charfauros*, 1999 Guam 18 ¶ 9 (per curiam) (collecting cases in which the court upheld authority of other branches of government when in conflict with judicial branch).

[48] To evaluate separation of powers challenges, this court has adopted the framework used by the United States Supreme Court. *In re Request of Leon Guerrero*, 2021 Guam 6 ¶ 23. "[T]wo separate elements must be evaluated: (1) whether the statutory provision prevents the accomplishment of constitutional functions and (2) if so, whether the disruptive impact is justified by any overriding constitutional need." *Id.* (alteration in original) (quoting *People v. Perez*, 1999 Guam 2 ¶ 17, *overruled on other grounds by People v. Shimizu*, 2017 Guam 11). "When the alleged breach of separation of powers involves the Judicial Branch, th[e] [first] inquiry focuses on two types of conflicts: a) whether the tasks assigned are more appropriately assigned to another branch, or b) whether the provision impermissibly 'threatens the institutional integrity of the Judicial Branch.'" *In re Extradition of Lin*, 915 F. Supp. 206, 214 (D. Guam 1995) (quoting *Mistretta v. United States*, 488 U.S. 361, 383 (1989)).

[49] Here the legislature's statutory method for computing time as applied to criminal appeals invades the province of the judiciary. It prevents the accomplishment of the judiciary's function of procedural administration of the courts, a task which is most appropriately carried out by the judiciary itself, rather than one of the other branches. *See Mistretta*, 488 U.S. at 386-90 ("Because of their close relation to the central mission of the Judicial Branch, such extrajudicial activities [referring to judicial rulemaking efforts] are consonant with the integrity of the Branch and are not more appropriate for another Branch."). In *Mistretta v. United States*, 488 U.S. 361 (1989), the United States Supreme Court upheld placement of the Sentencing Commission within the judicial

branch and affirmed that for more than a hundred years, Supreme Court jurisprudence has recognized "that rulemaking power pertaining to the Judicial Branch may be 'conferred on the judicial department.'" *Id.* at 387 (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825)). Admitting that the analogy was imperfect, the Court compared development of the Sentencing Guidelines to creation of procedural rules under the Enabling Act. *Id.* at 391-92.

> Such guidelines, like the Federal Rules of Criminal and Civil Procedure, are court rules . . . for carrying into execution judgments that the Judiciary has the power to pronounce. . . .  In other words, the Commission's functions, like this Court's function in promulgating procedural rules, are clearly attendant to a central element of the historically acknowledged mission of the Judicial Branch.

*Id.* at 391.

[50]     There is no overriding policy consideration that would dictate exclusion of holidays and weekends for periods of less than seven versus eleven days.  This is a question of procedural expediency rather than principle.  The legislature's statutory method for computing time fails both prongs of the two-part test for separation of powers concerns.  It prevents the accomplishment of the organic function of the judiciary but is not justified by any overriding constitutional need; the task of procedural rulemaking is not more appropriately assigned to another branch, and allowing the legislature to do so threatens the institutional integrity of the judiciary.  The legislature may not usurp the court's control over its own functions by proscribing *how* the judiciary may carry out its organic responsibilities.

### 2. The history of the adoption of the relevant statute, GRAP, and Organic Act amendment support this interpretation

[51]     This conclusion is supported by the history of the relevant statute, GRAP, and Organic Act amendment.  The relevant statutory provision preceded the legislature's adoption of the GRAP. Although the language included in the initial GRAP suggested that the legislature intended to cede rulemaking authority to the court on this issue, at the time concerns were raised that the judiciary

was still not a co-equal branch of government. In 2003, the Guam legislature passed a law partially addressing this concern, and then in 2004, the United States Congress amended Guam's Organic Act and granted the court authority to "make and promulgate rules governing the administration of the judiciary and the practice and procedure in the courts." Act of Oct. 30, 2004, Pub. L. No. 108-378, § 1(b), 118 Stat. 2206, 2207 (codified at 48 U.S.C.A. § 1424-1(a)(6)). Thus, the source of the court's rulemaking authority, while perhaps at first only a power ceded by the legislature, is now firmly rooted in the Organic Act.

[52]    The Criminal Procedure law of Guam (in which 8 GCA § 1.25 is found) was enacted by Guam Public Law 13-186 in 1976 and was codified in Title 8 of the Guam Code Annotated by Guam Public Law 15-104:7 in 1980. Title 8 GCA, Ref. & Annos., Source. The legislature authorized and approved the first appellate rules fifteen years later in 1995 pursuant to the Supreme Court of Guam Rules of Appellate Procedure Act, enacted as Guam Public Law 23-34. At that time, the method for computing time in then-Rule 14(a) was materially similar to the method contemplated in section 1.25. *See* Guam Pub. L. 23-34 (June 28, 1995), at p. 25 of attached rules (excluding weekends and holidays when prescribed period was less than seven days); 8 GCA § 1.25 (same). As adopted, the rules authorized the court to amend its own rules. *See* P.L. 23-34 at p. 42 of attached rules (for then-Rule 28). The rules also stated that "[i]nterpretations of these Rules as promulgated shall be supplied by the Supreme Court of Guam, whose authority is controlling in all counts." *Id.* at p. 1 of attached rules (Rule 1). This yielding of control suggests that even in 1995, the legislature may have intended to cede rulemaking authority to the Supreme Court for topics covered by the GRAP.

[53]    The independent authority of the court was again addressed by the legislature in 2003, at which time it passed (over the governor's veto) Guam Public Law 27-31, which was meant to

"reorganize the judiciary of Guam as the third co-equal and independent branch of government."

P.L. 27-31:1 (Oct. 31, 2003). Codified at 7 GCA § 3107, P.L. 27-31:9 provides that the Supreme

Court "may make and promulgate rules governing the practice and procedure in the courts." 7

GCA § 3107 (2005); P.L. 27-31:9. The law recognized, however, the further "need to protect the

integrity of the Judiciary from infraction by the other branches of government," a need which could

be resolved by an amendment to the Organic Act of Guam or adoption of a constitution by the

people of Guam. P.L. 27-31:1.

[54]     Such an amendment to the Organic Act occurred in October 2004, at which time the Guam

Supreme Court was explicitly granted authority to "make and promulgate rules governing the

administration of the judiciary and the practice and procedure in the courts." Act of Oct. 30, 2004,

Pub. L. No. 108-378, § 1(b), 118 Stat. 2206, 2207 (codified at 48 U.S.C.A. § 1424-1(a)(6)). The

legislative history of the Organic Act amendment also supports the conclusion that it was adopted

to protect and elevate the judiciary as a co-equal branch of government. *See, e.g.*, 150 Cong. Rec.

18,169-71 (2004) (statement of Congresswoman Madeleine Z. Bordallo describing the history of

the judicial system in Guam, the need for this legislation to create a "strong judiciary," and

attaching correspondence from the Governor, Legislature and Judicial Council supporting the bill;

notably the Governor's statement explicitly referenced the need to solidify "similar powers to

govern, reorganize, manage and account for its branch with judicial independence"); *Testimony on

Pub. Land & Forest Bills, Before the Subcomm. on Pub. Lands & Forests of the Comm. on S.

Energy & Nat. Res.*, 2004 WL 2190469, (Sept. 29, 2004) (statement of Congresswoman Madeleine

Z. Bordallo); H.R. Rep. No. 108-638 (2004).

[55]     Given the 2004 amendment to Guam's Organic Act, the authority to promulgate and apply

procedural rules is rooted in the Organic Act. Although 7 GCA § 3107 and the initial legislation

authorizing the GRAP may be read to reinforce and reiterate the court's authority over procedural rulemaking, these are not now the *source* of such authority, which is instead found in the Organic Act. *See, e.g.*, *Re: Amendments to the Guam Rules of Appellate Procedure*, PRM07-003 at 1 (Promulgation Order No. 07-003-06, Feb. 24, 2014) (promulgating amendments under authority granted by the Organic Act); *cf.* GRAP 1 ("These appellate rules are promulgated pursuant to the *Frank G. Lujan Memorial Court Act of 1992*, as amended, Title 7 of the Guam Code Annotated, and the Organic Act of Guam.").

[56]     In conclusion: we find that 8 GCA § 1.25 and GRAP 11 are both facially applicable yet irreconcilable. Consistent with other jurisdictions, we find that where a rule and a statute conflict on a procedural issue, such as the calculation of time to file an appeal, absent a clear legislative policy with a basis in something other than court administration, the court rule should control. This is consistent with the court's authority and mandate under the Organic Act. Thus, the mechanism for computing time found in GRAP 11 controls here, and Pinaula's appeal was timely. The People's Motion to Dismiss for Lack of Jurisdiction is therefore denied.

[57]     This court has jurisdiction over appeals from a final judgment of conviction entered by the Superior Court of Guam. 48 U.S.C.A. § 1424-1(a)(2); 7 GCA §§ 3107(b), 3108(a) (2005); 8 GCA §§ 130.10, 130.15(a) (2005).

### III.  STANDARD OF REVIEW

[58]     When a defendant raises the sufficiency of the evidence by a motion for judgment of acquittal, the court reviews the trial court's denial of the motion *de novo*. *People v. Wia*, 2020 Guam 17 ¶ 9 (citing *People v. Song*, 2012 Guam 21 ¶ 26).

//

//

## IV. ANALYSIS

### A. The Prosecution Was Not Required to Offer Direct Evidence, But the Evidence Presented Was Insufficient

[59]    Pinaula argues that the evidence presented was insufficient to convict him of the offense of Theft by Receiving.  We agree.

[60]    To review a claim for insufficiency of the evidence, the court reviews "'the evidence presented at trial in the light most favorable to the People and determine[s] whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *People v. Kotto*, 2020 Guam 4 ¶ 29 (quoting *Song*, 2012 Guam 21 ¶ 27).  This is a "highly deferential standard of review," and the defendant bears the burden "to establish 'that the evidence was legally insufficient to sustain a guilty verdict.'"  *Id.* (first quoting *People v. Wusstig*, 2015 Guam 21 ¶ 8; and then quoting *Song*, 2012 Guam 21 ¶ 28).  Accordingly, "our review must 'give[] full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"  *People v. Anastacio*, 2010 Guam 18 ¶ 18 (alteration in original) (quoting *People v. Jesus*, 2009 Guam 2 ¶ 60).  Although a high burden, this is an extraordinary case requiring reversal.

[61]    Theft by Receiving is defined in 9 GCA § 43.50(a).  "A person is guilty of *theft* if he intentionally receives, retains or disposes of movable property of another knowing that it has been stolen or believing that it has probably been stolen."  9 GCA § 43.50(a) (2005).  Therefore, the elements of Theft by Receiving are that the defendant (i) intentionally; (ii) receives, retains, or disposes of; (iii) movable property of another; (iv) knowing that it has been stolen or believing that it has probably been stolen.  *Id.*; *see also People v. Palisoc*, 2002 Guam 9 ¶ 13 (establishing that

intent is an element of Theft by Receiving).[7]  The People bear the burden to prove each element beyond a reasonable doubt.  *People v. Damian*, 2016 Guam 8 ¶ 14 (citing *People v. Perry*, 2009 Guam 4 ¶ 50).

[62]    A sufficiency of the evidence analysis evaluates whether there is enough direct or circumstantial evidence presented so reasonable inferences may be drawn supporting each element of the crime charged.  *Jesus*, 2009 Guam 2 ¶ 62.  Entirely circumstantial evidence may be sufficient.  *People v. Quintanilla*, 2020 Guam 8 ¶ 11; *People v. Martin*, 2018 Guam 7 ¶ 26.  However, "'juries must not be allowed to convict on mere suspicion and innuendo,'" and "[a] trial court should grant a motion for judgment of acquittal when the evidence merely raises a suspicion that the accused is guilty."  *Quintanilla*, 2020 Guam 8 ¶ 11 (first quoting *Anastacio*, 2010 Guam 18 ¶ 18; and then quoting *Song*, 2012 Guam 21 ¶ 29).  "A defendant is entitled to a judgment of acquittal when the People fail to produce evidence of the offense charged."  *Song*, 2012 Guam 21 ¶ 29.

[63]    Pinaula argues that "[n]o witness testified regarding Pinaula's alleged intent," Appellant's Br. at 17, apparently implying that intent must be proven by direct evidence or testimony.  We reiterate that intent can be proven by circumstantial evidence, and "'entirely circumstantial' evidence is sufficient to support a guilty verdict."  *People v. McKinney*, 2016 Guam 3 ¶ 22 (quoting

---

[7] Here, the jury instructions read, in part:

> The People must prove beyond a reasonable doubt that the Defendant, William John Pinaula:

1.  On or about May 18, 2017;

2.  In Guam;

3.  Did intentionally;

4.  Receive, retain, or dispose of the moveable property of *Morrico Equipment*, that is, a 2006 Mitsubishi Fuso Flat Bed Truck (GLP#238CV);

5.  Knowing that it had been stolen or believing that it had probably been stolen.

RA, tab 87 at Instr. 6a (Jury Instrs., Aug. 28, 2019).

*United States v. Boskic*, 545 F.3d 69, 85 (1st Cir. 2008)); *see also Anastacio*, 2010 Guam 18 ¶ 33 ("intent may be proved by circumstantial evidence"). In a similar vein, Pinaula argues more broadly that the case against him was deficient because various types of evidence were missing, such as eye-witness testimony, clear security camera footage, DNA evidence, fingerprint evidence, and forensic evidence. Appellant's Br. at 16-17. None of these were required, and we repeat: circumstantial *or* direct evidence may support a guilty verdict. *Jesus*, 2009 Guam 2 ¶ 62.

[64]   The People did present sufficient circumstantial evidence to establish a nexus between Pinaula and the truck, as well as his intent to receive and retain it. During trial, the defendant's Uncle Herbert positively identified the Morrico truck in photographs as the vehicle he saw parked in the backyard of the property next to his home where it was discovered by GPD. Herbert further testified that Pinaula resided on that property with his mother[8] and that after he saw the truck, he questioned Pinaula about its origins, to which Pinaula responded "it was [his] friend's truck." Tr. at 77-80, 89 (Jury Trial, Aug. 27, 2019). We assume, *arguendo*, that Herbert's testimony about the statement was not hearsay and was properly admitted under Guam Rule of Evidence 801(d)(2)(A) (defining as "not hearsay" a statement which "is offered against a party and is the party's own statement"). This admission by Pinaula, along with Herbert's testimony and other evidence about discovery of the truck, is enough to reasonably infer that Pinaula intentionally received and retained the truck.

[65]   Herbert also testified he did not see the truck the day before his conversation with Pinaula. Because of the timeframe that Molinos learned of the truck's location after it went missing from the Morrico facility, the immediate discovery of the truck by GPD shortly thereafter, and that

---

[8] Although Herbert testified that Pinaula lived at the house with his mother, according to the arresting officer the defendant's mother asserted several times that the defendant did not stay with her, and he was in fact apprehended elsewhere.

Herbert did not see the truck the night before his conversation with Pinaula, the jury could make the reasonable inference that Pinaula intentionally received and retained the truck sometime after it went missing from the Morrico facility. While the jury had to rely on inferences from the circumstantial evidence, its finding was not "'so insupportable as to fall below the threshold of bare rationality.'" *Quintanilla*, 2020 Guam 8 ¶ 11 (quoting *People v. Taitano*, 2015 Guam 33 ¶ 12).

[66]    Neither party disputes that the truck belonged to Morrico. Molinos testified that when he arrived at the Morrico facility, he noticed the front gate was open and that a chain used to secure the gate had been cut. He also testified that as he surveyed the facility, he observed a truck was missing; this was confirmed by surveillance footage viewed by Officer Querubin showing, around midnight, movements inside and around the truck and a vehicle later exiting the facility. Because of the GPS tracking device installed on the truck, Molinos tracked the truck to an area in Adacao behind a residence where it was identified shortly thereafter by GPD. And defense counsel explained during opening statements that the case was "about stolen property." Tr. at 19 (Jury Trial, Aug. 27, 2019).

[67]    The People introduced evidence from which the jury could have found the first, second, and third elements of the crime of Theft by Receiving, that is Pinaula (i) intentionally; (ii) received, retained, or disposed of; (iii) the movable property of another. There was no evidence presented, however, from which the jury could have inferred the fourth element of the crime: that the defendant knew or believed that the truck was probably stolen. The prosecution provided evidence showing that the truck was found in a field behind the defendant's house, that it had been parked there since approximately 4:00 a.m., that the defendant knew of the truck, and that the truck had been tampered with.

[68]    But there was nothing to show that the defendant had examined the truck, knew of its condition, or had reason to be suspicious of the truck other than that it bore commercial insignia. Officer Wright testified that the truck looked to be "in disarray" and that the ignition "appeared to be tampered with," but no witness or other evidence established that Pinaula had gotten close enough to the truck to perceive the condition of the vehicle. *Id.* at 72, 90 (providing testimony from defendant's uncle that although the defendant "went over," Herbert could not "really remember if [the defendant] was over at the vehicle"). The dissent acknowledges that no witness or evidence established Pinaula was aware of the condition of the truck but suggests anyone who received and retained it could see that it was stolen, and this circumstantial evidence is sufficient to prove each of the elements beyond a reasonable doubt. But Herbert's testimony, crucial to establishing a nexus between Pinaula and the truck, undermines this belief. Although Herbert testified that Pinaula told him that the truck belonged to Pinaula's friend, Herbert also testified that he had no suspicions about the truck "because I've never known him to actually bring something back there that didn't belong to us." *Id.* at 80. The arresting officer testified that he executed a search warrant of the defendant's house but could not recall finding any of the missing air compressor bolts or hoses.

[69]    The dissent emphasizes that evidence to submit a guilty verdict may be wholly circumstantial and that on appeal this court should not reweigh the evidence. *See infra* ¶ 74. With this we concur. Here, we do not insert ourselves as factfinders, choosing between reasonable interpretations of the evidence. Rather, we find that insufficient evidence was presented to support a finding that Pinaula knew or believed that the truck was probably stolen. Without evidence, circumstantial or direct, no reasonable inferences may be drawn supporting this element of the crime charged. The People admit that the direct evidence was scant and urge us to rely on "the

circumstantial evidence and the reasonable inferences drawn from it" to uphold the verdict. *See* Appellee's Br. at 5, 12, 19. The problem here is that the circumstantial evidence presented by the People merely raises a suspicion that Pinaula is guilty and is insufficient to satisfy the People's burden to prove each element beyond a reasonable doubt. *See Quintanilla*, 2020 Guam 8 ¶ 11 (a jury must not be allowed to convict only on mere suspicion and innuendo). The insufficiency is underscored by the trial court's dismissal of the other charge of Theft by Receiving of the Light Tower. The only additional facts tying the truck to the defendant were the truck on the property where Herbert alleged the defendant lived and the testimony that Pinaula told Herbert that the truck "was [his] friend's." Tr. at 77-79, 89 (Jury Trial, Aug. 27, 2019). This is insufficient to establish the fourth element of Theft by Receiving: that the defendant knew or believed that the truck had probably been stolen. Because the People did not carry their burden to produce any direct or circumstantial evidence from which a jury might infer that Pinaula knew or believed the truck was likely stolen, the conviction must be reversed.

## B.  Hearsay and Prosecutorial Misconduct

[70]    Because we reverse the defendant's conviction for insufficiency of the evidence, we need not reach the issue of whether Herbert's testimony about Pinaula's statement was hearsay, nor the prosecution's allegedly improper statements to the jury. *See Unpingco v. Derry*, 2021 Guam 1 ¶ 21.

## V.  CONCLUSION

[71]    The People's Motion to Dismiss is **DENIED,** and we **REVERSE** the defendant's conviction. The judgment is **VACATED**.


|  /s/  |  /s/  |
| :---: | :---: |
| ROBERT J. TORRES | KATHERINE A. MARAMAN |
| Chief Justice | Associate Justice |

**CARBULLIDO, J., concurring in part and dissenting in part:**

[72]     I concur with the majority regarding the court's jurisdiction to hear the case.  However, I would find there was sufficient evidence for the jury to have convicted Pinaula and would affirm.

## I.  STANDARD FOR INSUFFICIENCY OF THE EVIDENCE CLAIMS

[73]     I repeat the standard articulated by the majority.  To review a claim for insufficiency of the evidence, the court reviews "'the evidence presented at trial in the light most favorable to the People and determine[s] whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *People v. Kotto*, 2020 Guam 4 ¶ 29 (quoting *People v. Song*, 2012 Guam 21 ¶ 27).  This is a "highly deferential standard of review," and the defendant bears the burden "to establish 'that the evidence was legally insufficient to sustain a guilty verdict.'"  *Id.* (first quoting *People v. Wusstig*, 2015 Guam 21 ¶ 8; and then quoting *Song*, 2012 Guam 21 ¶ 28).  Thus, "our review must 'give[] full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"  *People v. Anastacio*, 2010 Guam 18 ¶ 18 (alteration in original) (quoting *People v. Jesus*, 2009 Guam 2 ¶ 60).

## II.  THE PROSECUTION WAS NOT REQUIRED TO OFFER DIRECT EVIDENCE

[74]     In his brief, Pinaula alleges there was no eye-witness testimony, co-actor testimony, clear security camera footage, fingerprint evidence, DNA evidence, or forensic evidence.  Appellant's Br. at 16-17.  This is true, but the prosecution was not required to produce such evidence.  "In a sufficiency of the evidence analysis, courts determine whether there is sufficient direct *and/or* circumstantial evidence from which reasonable inferences can be drawn to support each element of the crime or crimes charged."  *Jesus*, 2009 Guam 2 ¶ 62 (emphasis added).  Further, evidence sufficient to support a guilty verdict can be wholly circumstantial and "'the factfinder is free to

choose among reasonable interpretations of the evidence'" to find any element of the offense charged. *Id.* (quoting *United States v. Boskic*, 545 F.3d 69, 85 (1st Cir. 2008)). While eye-witness testimony, co-actor testimony, clear security camera footage, fingerprint evidence, DNA evidence, and forensic evidence would have strengthened the People's case, it is not the court's job on appeal to reweigh the evidence. *See People v. Robert*, 2019 Guam 2 ¶ 8.

[75]    Pinaula further claims "[n]o witness testified regarding Pinaula's alleged intent," "[n]o witness testified that Pinaula knew or believed that the truck was stolen," "[n]o witness established Pinaula observed the interior or exterior of the truck," and "[n]o witness established Pinaula was aware of the condition of the truck." Appellant's Br. at 17; Appellant's Reply Br. at 4. These assertions are also true; however, *mens rea* or criminal intent can be and is often proven by circumstantial evidence, and "'entirely circumstantial' evidence is sufficient to support a guilty verdict." *People v. McKinney*, 2016 Guam 3 ¶ 22 (quoting *Boskic*, 545 F.3d at 85); *see also People v. Quintanilla*, 2020 Guam 8 ¶ 11 (stating that "'circumstantial evidence is sufficient to sustain a conviction'" (quoting *Anastacio*, 2010 Guam 18 ¶ 18)). And "the fact that . . . evidence is circumstantial does not undermine its sufficiency." *People v. Martin*, 2018 Guam 7 ¶ 26.

[76]    The People acknowledge the circumstantial nature of the case and the lack of direct proof to show Pinaula intentionally received or retained the truck knowing it had been stolen or believing it probably had been stolen. *See* Appellee's Br. at 5, 12, 19-21. Instead, the People contend they introduced sufficient evidence to support each element for Theft by Receiving "[b]ased on the circumstantial evidence and the reasonable inferences drawn from it." *Id.* at 19. The People correctly note that each of the requirements imposed by statute may be inferred from circumstantial evidence.

### III. ELEMENTS OF THEFT BY RECEIVING

[77]     I concur with the majority's analysis of the elements of the crime. The elements of Theft by Receiving are that the defendant (i) intentionally; (ii) receives, retains, or disposes of; (iii) movable property of another; (iv) knowing that it has been stolen or believing that it has probably been stolen. 9 GCA § 43.50(a).

[78]     That the truck belonged to Morrico does not appear to be debated by either party. *See, e.g.*, Tr. at 19 (Jury Trial, Aug. 27, 2019) (opening statement by defense counsel that the case is "about stolen property"). At dispute between the parties are the following elements: whether sufficient evidence was presented showing that Pinaula intentionally received, retained, or disposed of the Morrico truck; and whether sufficient evidence was presented showing that Pinaula knew or believed the truck was probably stolen. The majority and I agree that sufficient evidence was presented for a rational trier of fact to find beyond a reasonable doubt that Pinaula (i) intentionally; (ii) received or retained (iii) the movable property of another. Contrary to the majority, viewing the evidence in the light most favorable to the People, I would additionally find sufficient evidence that Pinaula (iv) knew that the property had been stolen or believed that it had probably been stolen.

### IV. SUFFICIENT CIRCUMSTANTIAL EVIDENCE WAS PRESENTED THAT PINAULA KNEW OR BELIEVED THE TRUCK WAS PROBABLY STOLEN

[79]     Pinaula argues that without the statement of his uncle, which he inaccurately contends was hearsay, *see infra* Section V, no evidence was presented that Pinaula "knew or believed the truck had been stolen." Appellant's Br. at 23. The majority agrees that the evidence was insufficient; I do not.

[80]     There was sufficient evidence to support the inference that Pinaula knew or believed the truck was probably stolen. The People presented evidence showing the truck displayed physical signs it had been stolen. Officer Wright, who discovered the truck in Adacao, testified the truck

looked to be "in disarray" and the ignition "appeared to be tampered with as if somebody tried to access the ignition to start that truck." Tr. at 72 (Jury Trial, Aug. 27, 2019). Molinos also testified he noticed the steering column of the truck was broken and the truck was missing some hose reels. He also observed that an air compressor at the back of the truck had been unbolted. Furthermore, the truck contained visible signs that it belonged to Morrico, including Morrico insignia on the side and "visible signs" on the truck's mudflaps. *Id.* at 72. Such evidence supports the inference the truck had been stolen from Morrico, was operated unlawfully or tampered with, and that anyone who received and retained it could see that it was stolen.

[81]    While "no witness or other evidence established that Pinaula had gotten close enough to the truck to perceive the condition of the vehicle," *supra* ¶ 68, the truck was parked a mere 100 feet from the house in the backyard, Tr. at 72, 80 (Jury Trial, Aug. 27, 2019). Although Herbert said he had "no suspicions about the truck," *supra* ¶ 68, he knew "it didn't belong there" because it belonged to neither Herbert nor the defendant, Tr. at 89-90 (Jury Trial, Aug. 27, 2019). Moreover, the truck was recently missing from Morrico, and the GPS device installed inside it traced the truck's location from Morrico to the backyard of the house at which Herbert alleged that Pinaula lived. It is unsurprising that the arresting officer, who searched Pinaula's house pursuant to a warrant, could not recall finding the missing air compressor bolts or hose reels given the prosecutor's admission that other individuals were likely involved. Based on this circumstantial evidence and Pinaula's admissions to Herbert, the jury could infer that Pinaula knew or believed the truck was probably stolen when he received and retained it.

[82]    The majority urges that their position is "underscored by the trial court's dismissal of the other charge of Theft by Receiving of the Light Tower" because "[t]he only additional facts tying the truck to the defendant were the truck on the property where Herbert alleged the defendant lived

and the testimony that Pinaula told Herbert that the truck 'was [his] friend's.'" *Supra* ¶ 69. These facts go to the nexus between Pinaula and the truck, but there were several other facts that pointed to the defendant's knowledge or belief that the truck had probably been stolen. The truck was damaged in several respects in a manner consistent with vehicle theft. It also bore numerous signs that it belonged to Morrico. Furthermore, the GPS unit traced its location during the wee hours of the morning from the Morrico facility to the location at which Pinaula explained the truck's presence to Herbert.

[83]    And while such evidence is circumstantial, "[i]t is not the province of the court . . . to weigh the evidence; such matters are for the jury." *Kotto*, 2020 Guam 4 ¶ 34 (quoting *People v. Taisacan*, 2018 Guam 23 ¶ 17). This is not a case of overwhelming evidence of guilt, especially considering the potential involvement of unidentified parties and limited evidence as to Pinaula's conduct. However, review for sufficiency of evidence

> "does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Instead, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact *could* have found the essential elements of the crime beyond a reasonable doubt."

*Jesus*, 2009 Guam 2 ¶ 59 (citations omitted). Viewing the evidence in the light most favorable to the People, a rational trier of fact could have found each of the essential elements of Theft by Receiving beyond a reasonable doubt.

## V.  PINAULA'S STATEMENT TO HIS UNCLE HERBERT WAS NOT HEARSAY

[84]    Finally, as the majority assumes *arguendo*, Pinaula's statement to his Uncle Herbert was not hearsay. Where a statement is alleged to be hearsay on appeal but the statement was not objected to during trial, we review for plain error. *People v. Mendiola*, 2014 Guam 17 ¶ 23 n.2.

[85]    In his opening brief, Pinaula argues that the trial court improperly admitted the testimony by Pinaula's Uncle Herbert that Pinaula told Herbert that "the truck was [the defendant's] friend's," arguing that the statement was hearsay. Appellant's Br. 24-32. Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Guam R. Evid. 801(c). As the People correctly point out, under Guam Rule of Evidence 801(d)(2)(A), an admission by a party-opponent is not hearsay when "[t]he statement is offered against a party and is (A) the party's own statement." Appellee's Br. at 21. Here: the statement was offered against defendant and was defendant's own statement; thus, it was not hearsay.

[86]    In his reply brief, Pinaula conceded that "admissions by a party-opponent are not hearsay." Appellant's Reply Br. at 12. At oral argument, however, counsel for Pinaula continued to maintain a hearsay objection on the grounds that the statement was not an "admission." *See* Oral Argument at 10:37:08-55 (Nov. 30, 2021). Because the statement was Pinaula's and was used against Pinaula, it is covered by Rule 801(d)(2)(A) and is not defined as hearsay. *Cf.* Fed. R. Evid. 801, Advisory Comm. Notes, 2011 Amend. (noting that the subtitle to the analogous provision in the federal rules had been amended to remove reference to "admissions" "because not all statements covered by the exclusion are admissions in the colloquial sense – a statement can be within the exclusion even if it 'admitted' nothing and was not against the party's interest when made" and because it "rais[ed] confusion in comparison with the Rule 804(b)(3) exception for declarations against interest").

[87]    Here, counsel may have been conflating Rule 801(d)(2)(A) with Rule 804(b)(3), which provides an exception to the hearsay rule if the declarant is unavailable as a witness and the statement is against interest. Because the statement was not hearsay under the definition provided

in Rule 801(d)(2)(A), no exception to the hearsay rule is required. The statement was properly admitted.

## VI. CONCLUSION

**[88]** I would also find that neither of the prosecution's challenged statements were erroneous. Thus, I would affirm the conviction.

/s/
_____
F. PHILIP CARBULLIDO
Associate Justice
